IN THE COURT OF THE UNITED STATES
DISTRICT OF SOUTH CAROLINA
COLUMBIA DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | CRIM. NO: 3:05-1011 (JFA, JR.) |
| | ) | |
| vs. | ) | |
| | ) | MOTION FOR UPWARD |
| **JAMES M. SHORTT** | ) | DEPARTURE PURSUANT TO |
| | ) | U.S.S.G. 5K2.0 |

**INTRODUCTION**

Now comes the Government and moves for an upward departure pursuant to United States Sentencing Guidelines Section 5K2.0, on the ground that the 2005 Sentencing Guidelines do not adequately take into consideration key circumstances intrinsic to this case. The Government specifically refers the Court to the criteria for sentencing referenced in 18 U.S.C. § 3553. The advisory sentence indicated by the presentence report, which would subject the defendant to a sentence between zero and six months, does not "reflect the seriousness of the offense, [] promote respect for the law, [or] provide a just punishment for the offense." 18 U.S.C. § 3553(a)(2)(A). In addition, it does not "afford adequate deterrence to criminal conduct," in that a probationary sentence for such egregious behavior provides little to no disincentive to those who would choose to traffic in anabolic steroids and human growth hormone. 18 U.S.C. § 3553(a)(2)(B). The basis for this motion is (1) the Sentencing Guidelines, even as amended, do not sufficiently address the seriousness of the defendant's conduct in trafficking in performance enhancing drugs; (2) the guidelines fail to include human

1

growth hormone in § 2D1.1, where it belongs; (3) the defendant's inexcusable prescribing of steroids to a teenager is not accounted for by the guidelines; and (4) the partial adoption in the presentence report of the March 27, 2006 Amendment to the 2005 Guidelines Manual results in a piecemeal sentence that does not take into account the totality of the revised sentencing scheme.

## ARGUMENT

The presentence report for Defendant James E. Shortt results in an offense level of eight, corresponding to a theoretical zero to six months in prison. This range permits a sentence of straight probation – a sentence that in the view of the Government is completely inadequate. Information submitted to the Court indicates Shortt prescribed at least 1,217 ml of injectable anabolic steroids, 1,110 ml of anabolic steroid cream, 246 anabolic steroid troches (lozenges), and 225 anabolic steroid tablets. The prescriptions span from January 30, 2001, through June 1, 2004 – a period of three and a half years. Counting original prescriptions and refills, the Defendant authorized the dispensing of 139 separate anabolic steroid prescriptions during that time period. A conservative estimate of the human growth hormone dispensed in the same period is 816 units. All of these drugs were distributed by the Defendant for purposes of performance enhancement,[1]

---

[1]As he says to Wesley Walls on February 18, 2003, "And for you guys, what I'm looking for is nondetectable performance enhancement." Defendant Shortt to Jeffrey Mitchell on June 11, 2003, "You are Jeffrey Mitchell, and you came to see me just a little less than a month ago essentially looking for legal or legitimate performance enhancement." Finally, Defendant Shortt to Todd Sauerbrun on June 24, 2003, "So you came to see me when? The 5th of May – 5th of June, wanting some performance

2

which is not a legitimate medical purpose.  Additionally, the Defendant appeared three times on nationally broadcast programs – twice on Sixty Minutes and once on HBO's CostasNow program – to flaunt his conduct, saying in reference to the case against him, "I personally believe in my heart of hearts they're going to have a very difficult time, because I haven't done anything wrong."  Of course, as presented to this Court on at least two occasions, the audiotapes of the Defendant's consultations with his patients tell a different story, one where everyone acknowledges performance enhancement as the goal, and where professional athletes are coached on how to beat the NFL testing regime.[2]

Additionally, the public policy implications are significant.  Congress has clearly staked out a position that steroid use, particularly in sports, is unacceptable, most notably in the Major League Baseball hearings conducted by the House Government Reform Committee in March 2005 and a closed-door session of the Senate Commerce Committee

---

enhancement.  We can do that.  Legal performance enhancement because you're drug tested in your occupation."

[2]From the Wesley Walls tape, February 18, 2003: "Now, here's the key.  You want to use a natural testosterone.  You do not want to use testosterone or any kind of Depo, because that's how they test you, they look for the Depo.  Because you can't test -- if I test you for testosterone, yeah, you're going to have some.  And for somebody like you, I can triple your testosterone levels without blowing any whistles.  If you use a Depo testosterone, your ratios don't come out right, okay?  Because it's -- or if you use fake anabolics.  Deca Durabolin, Winstrol, you know, Anadrol.  If you start using those, those little ratios they test will skew.  If you use a natural testosterone, your ratios always come out right.  Now, your levels will come up; but as your testosterone comes up, its metabolites come up because it will go through the process.  You just have a block between androstenedione and testosterone.  Your system doesn't make it as well as it might out of androstenedione.  That's just Wesley -- that's your individual biochemistry.  The key to that is supplementation with testosterone.  That's -- that's what we do."

in May 2004. The Bay Area Laboratory Co-Operative (BALCO) case further accentuated the abuse of steroids in professional baseball, football, the Olympics, and track and field. Barry Bonds' pursuit of the home run record is overshadowed and tarnished by his connection with BALCO and allegations that he knowingly used designer performance-enhancing drugs. Additionally, as recently as June 6, 2006, thirteen federal agents executed a search warrant at the home of former New York Yankees and Arizona Diamondbacks pitcher Jason Grimsley based on previous statements by him that he had used human growth hormone and anabolic steroids at least ten to twelve times.[3] Finally, the suicide deaths of amateur athletes Rob Garibaldi, age 24, of Petaluma, California, Efrain Marrero, age 19, of Vacaville, California, and Taylor Hooton, age 17, of Plano, Texas, all indicate that the pressures associated with athletic performance, when combined with the ready availability of steroids, can have tragic consequences.

In this context, this Court is presented with a probationary sentence for a medical doctor who knowingly and intentionally prescribed anabolic steroids and human growth hormone to professional athletes, amateur bodybuilders, and law enforcement officers. Consider how this case differs from a typical steroid distribution case. The Defendant built a substantial practice based on his providing performance enhancing substances to professional athletes. His reputation was such that, by his own admission to HBO, he had athletes flying in "from all over" to obtain these drugs, drugs that were banned by the

---

[3]Grimsley also admitted during his April 19, 2006, interview, that he had been using amphetamines, another commonly abused drug in professional sports.

4

NFL and, in this context, illegal. The professional athletes he was servicing were and are regarded as role models by thousands of young people who aspire to achieve the same levels of success and recognition in their own lives – young people like Rob Garibaldi, Efrain Marrero, and Taylor Hooton. These young people are no doubt heavily influenced by the win-at-all-costs mindset that the Defendant served. When the activities of the Defendant were made public, he appeared at least three times on nationally televised programs to profess his innocence, effectively telling these impressionable student-athletes that abusing their bodies by using performance-enhancing drugs was an acceptable alternative to playing by the rules.

Contrast that behavior with the likely response of a steroid dealer caught distributing from the back door of a gym. His buyers are not role models. He is not afforded a national television audience to profess his innocence and sell his brand of success. He lived in anonymity before, and by his own preference, he will likely live in anonymity afterwards, ashamed of his conduct and hoping that his actions will not be made public.

The same Sentencing Guidelines, driven primarily by drug weight, apply to both. The Sentencing Commission, in formulating these guidelines, was clearly at a disadvantage in contemplating all the factual scenarios under which these guidelines would be applied. Though the Government takes issue with the conversion factors contained within the 2005 Sentencing Guidelines as well as those imported from the 2006 Amendment, the Government also finds fault in a potential sentence that does not take

5

into account who the Defendant's patients were, the publicity sought and received by the Defendant, and the impression the Defendant's sentence will make on the public when considered in light of his blatant conduct. This is consistent with the sentencing factors contemplated in Title 18, United States Code, Section 3553, which include, in section (a)(1), "the nature and circumstances of the offense...", and, in section (a)(2) "the need for the sentence imposed (A) to reflect the seriousness of the offense, to promote respect for the law, and to provide a just punishment for the offense; [and] (B) to afford adequate deterrence to criminal conduct...."

Considering these factors, the Government asserts that (1) the Sentencing Guidelines, even as amended, do not sufficiently address the seriousness of the defendant's conduct in trafficking in performance enhancing drugs, as indicated by the probationary result; (2) the guidelines fail to include human growth hormone in § 2D1.1, where it belongs, eliminating a substantial portion of the criminal conduct from consideration; (3) the defendant's inexcusable prescribing of anabolic steroids to a teenager is not accounted for by the guidelines; and (4) the partial adoption in the presentence report of the March 2006 Amendment to the 2005 Guidelines Manual is limited to the conversion factor for steroid cream and does not take into account the comprehensive solution that adds enhancements for using masking agents and for prescribing steroids to athletes.[4]

---

[4]The Government is not arguing that the presentence report should include such enhancements, since they were clearly enacted after the conduct for which the Defendant

6

In summary, the Sentencing Guidelines as applied to this case trivialize the offense by deeming probation appropriate. Such a sentence would only encourage other individuals to flaunt the law, knowing that the penalty for trafficking anything less than a massive quantity of steroids results in a negligible sentence. Furthermore, the fact that the guidelines consider the abuse of human growth hormone as fraud completely misconstrues the nature of the crime. The anabolic steroids and human growth hormone were provided for the same purpose – to maximize physical performance using illegal, harmful substances. The appropriate sentence is a custodial sentence reflecting the significant quantities prescribed over three and a half years.

I.    **The Sentencing Guidelines, even as amended, do not sufficiently address the seriousness of the defendant's conduct in trafficking in performance enhancing drugs.**

From January 30, 2001, through June 1, 2004, the Defendant authorized at least 139 anabolic steroid prescriptions, allowing the dispensing of at least 1,217 ml of injectable anabolic steroids, 1,110 ml of anabolic steroid cream, 246 anabolic steroid troches (lozenges), and 225 anabolic steroid tablets. The Government found no information indicating the Defendant ever turned away anyone who came to him seeking these drugs for illegal purposes. In addition, the Defendant routinely ignored the results

---

has been prosecuted. However, the piecemeal application of the original guidelines and the Amendment has worked entirely to the Government's detriment in this case. A sentence that upholds the guidance found in 18 U.S.C. § 3553 is better found through the application of judicial discretion rather than by putting together like a jigsaw puzzle the guidelines found in various places.

of his own preferred test – the Androgen Pathway test – that indicated the individuals coming to him either (1) had sufficient levels of testosterone already, (2) exhibited symptoms of steroid abuse in the past, or (3) were already using precursor chemicals such as androstenedione and DHEA for purposes of performance enhancement.

Though much of the focus in this case has centered on the athletes, the following conversation with a patient, recorded December 11, 2001, provides dramatic evidence that the Defendant was a one-stop shop for those "just wanting to be bigger, wanting to be stronger...."

> Essentially, all the gear that you can use does one thing only, supports your workouts.  If you don't work out, you don't get bigger, sorry.  Ain't going to happen.  You can take all the Deca Durabolin, you can take nandrolone, you can take all of that shit – Anadrol 50, and you won't get any bigger unless you work out.
>
> Your testosterone level, yeah, yank that one out.  You really don't have a whole hell of a lot of testosterone.  You've got great DHEA, your androstenedione is good, your estrone is not too awful high, progesterone is okay, DHT is all right.  Everything is okay.  But in somebody like you taking that much stuff, I'd like to see your testosterone more up like about 150; 175 is an optimal level for a builder.  So you are somebody I would say, yeah, use some testosterone.  And then recheck that in 90 days, but, yeah, I would definitely do something.
>
> There's really two ways to do it, and mostly it depends on whether or not you can give yourself a shot.  If you give yourself a shot, I usually use – and you don't get drug tested – I usually use a combination of Deca Durabolin and Cypionate, Enanthate, Propionate.  They make a lot about the differences, but the only repetitive thing is *testosterone* cypionate, *testosterone* propionate, *testosterone* enanthate.  I don't care what anybody tells you, that's a bunch of bullshit.  What does the job is testosterone, so...pick your favorite one.

Testosterone, in its various forms, is what's going to give *you* your bang for the buck.

Essentially, the Defendant is a personal trainer with a medical degree and an affinity for chemicals. "Gear" is bodybuilder slang for anabolic steroids. He advises the patient that he has to work out to get the benefit of the drugs. The benefit, of course, is getting bigger. As for the particular drug to take, he counsels "pick your favorite one." One is hard-pressed to imagine a medical doctor in a legitimate context counseling patients to select a drug that will give them the best "bang for the buck."

The Government requested Gary I. Wadler, M.D., of the New York University School of Medicine, to review the records of the Defendant's patients. Dr. Wadler is a specialist in internal medicine and sports medicine and a member of the World Anti-Doping Agency. In his report, Dr. Wadler concluded that --

> [T]here is a pattern of behavior on the part of Dr. James M. Shortt to...prescribe anabolic steroids and human growth hormone to patients in the absence of a legitimate disease or other recognized medical condition. In fact, in seven of the twelve patients, their medical record explicitly mentions "Performance Enhancement" either in the Chief Complaint, Impression, Plan or Assessment. It is a well established fact, that both anabolic steroids and human growth hormone are drugs that are readily abused by individuals to enhance performance, principally by increasing lean body mass (muscle). It is also well documented, that both anabolic steroids and human growth hormone are potentially dangerous drugs, which when used by adults can lead to diseases associated with significant morbidity and mortality. It is clear from the medical records that a number of the patients cited in the indictment did experience adverse effects as a manifestation of their use of these drugs.

Against this backdrop, the Court is confronted with an advisory guideline range of zero to six months. Considering the quantity of anabolic steroids prescribed, the

duration of the conduct, the Defendant's demonstrated awareness of his outlaw brand of medicine, the illegality of performance enhancement as justification for prescribing these substances, and the ignored risks to the patients, a probationary sentence grossly misses the mark. The Government encourages this Court to depart from the guidelines and impose a custodial sentence that reflects the seriousness of trafficking in anabolic steroids, promotes respect for drug distribution laws in this context, provides a just punishment for this offense, and affords adequate deterrence to those who would traffic in anabolic steroids in the future, particularly medical doctors. 18 U.S.C. § 3553.

II.     **The guidelines fail to include human growth hormone in § 2D1.1, where it belongs, eliminating a substantial portion of the criminal conduct from consideration.**

Fundamentally, the human growth hormone (HGH) prescribed by the Defendant was for performance enhancement. As he says to a patient during a taped visit on November 13, 2003,

> Growth hormone? Well, benefits are it increases endurance, you feel better. Again, it works as an anabolic, it wants to change fat into muscle, it seems to help workouts immensely. In a child, growth hormone is just for what you think, it's to grow. In an adult, it's a heal and repair hormone, so you heal and repair better.

During the Todd Sauerbrun consultation, conducted June 24, 2003, the Defendant advises:

> Now, are there areas that we can go up on you? Growth hormone big time. You're definitely low. I mean, you're kind of in the *eh*[5] range for your age,

_____

[5]Reviewing the recording, "eh" is the sound the Defendant makes, conveying to the patient "so-so" or "okay."

but you're about 40 percent of what I'd like to see in somebody in your line of work, so you've got a long way to go. And, then again, same thing. It's kind of like testosterone. Takes off fat, turns it into muscle. It won't affect your control, also non-detectable, so there's – there – there is your hormone. That's, that's the one for Todd. I've seen some of your *compadres* come in here with – like beautiful testosterone levels, I've seen them come in here with no testosterone and, again, growth hormones across the board. So with you, HGH is going to be a good thing.

The Sentencing Guidelines for violations of the human growth hormone statute, generally found at 21 U.S.C. 333, refer to section 2N2.1. Application Note 4 associated with 2N2.1 states, "The Commission has not promulgated a guideline for violations of 21 U.S.C. § 333(e) (offenses involving human growth hormones)."[6] In the absence of such guidance, the Probation Office applied the fraud guidelines. Since the fraud guidelines are driven by dollar loss, and dollar loss is not readily discernible due to the Defendant's record keeping, the result is another negligible sentencing range, cancelled out by the comparable anabolic steroid sentencing range. In effect, the Defendant's conduct in prescribing human growth hormone *for the same reason* he prescribed the anabolic steroids is excused due to an oversight, a hole in the guidelines with a cross reference to a non-analogous section. Human growth hormone is abused as a performance enhancing drug; it was prescribed by the Defendant for purposes of performance enhancement, and it should have been included within the Sentencing Guidelines under Section 2D1.1.

_____

[6]The Sentencing Commission is not the only one not to have guidelines regarding the abuse of human growth hormone. None of the major professional sports leagues test for HGH in part because of the difficulty detecting it. As such, it has become the performance-enhancing drug of choice among those who are regularly tested and can afford it.

Part of the difficulty in calculating the quantity of HGH applicable to this case is that the Defendant dispensed the drug directly from his office,[7] with varying instructions and incomplete notations as to quantity. Investigators were unable to rely on prescriptions, as they did to calculate the anabolic steroid quantities, and instead had to assemble the HGH portion of the case from notes in the medical files. These notes appear to be incomplete; however, they support a conservative estimate of 816 units dispensed, a significant number considering the Defendant's representations to his patients of the cost involved.[8] The quantity each unit represents seems to vary.

For example, on September 19, 2003, the Defendant wrote instructions to one of the professional football players regarding mixing the HGH:

> ...for the moment, we have Saizen (15 units) instead of Serostim (18 units). If you want to use the concentrated solution, take 1cc of water out of the large bottle and put into powder. Use the powder bottle to draw the

---

[7]In the June 24, 2003, Todd Sauerbrun patient consultation, the Defendant confirms, "I'll take you in the back and I'll show you how to mix up growth hormone, and that way you can do it." With Wesley Walls on February 18, 2003, he says, "So that's why if I get it to you – if you want to do that, the best price I've got is 250 per bottle if you want to buy it as a seven-bottle unit....Now, one of those bottles, which is six milligrams, should last you, like, two and a half weeks or something." Later in the Walls conversation, he indicates, "If you have any trouble finding this up around Charlotte, just give me a call. Like I say, normally I have growth hormone here. I just happen to have gotten wiped out."

[8]During a June 19, 2002, patient consultation, the Defendant advises, "With the growth hormone level as high as yours is, you don't need much. I would not spend the money on injectable growth hormone, because it's haltingly expensive." During the February 2003 Wesley Walls consultation, the Defendant advises, "The bad news is that HGH is one of the more expensive things out there. But it's very good and, again, nondetectable. That's why everybody is using it...."

12

injections from.  The bottle of water can be used if you want bigger volume. Use 3 3/4 cc. (Take out all water and get rid of all but 3 3/4 cc of water)  This would give 1/4 cc per unit.  You can do whichever.

For conversion purposes, then, it appears the Defendant's unit-to-cubic centimeter ratio is flexible; however, at least in this instance, one of the Defendant's units is the equivalent of 1/4 cc.  Of course, under the Sentencing Guidelines for steroids applicable to this case, ten cubic centimeters equals one unit.  So it would take *forty* of the Defendant's units to equal *one* Sentencing Guideline unit – if HGH were treated analogously to anabolic steroids – further undermining the complete inadequacy of the applicable Sentencing Guidelines for *both* HGH and anabolic steroids.[9]

Further complicating the calculation is guidance given to a second Carolina Panthers football player.  In an April 19, 2003, handwritten note found in the medical file, the Defendant writes:

I find that mixing the HGH in 1cc with measuring .055cc is a pain.  Soooo! My suggestion is use the enclosed 10cc bottles and mix with 9cc or 4 ½ cc of water.  That way, your injection would be ½ cc per shot (if you mix with 9cc) or 1/4 cc (if you mix with 4 ½ cc).  I have enclosed syringes and needles.[10]

---

[9]The March 2006 Amendment to the Sentencing Guidelines does away with the 10cc:1 unit ratio and adopts a 0.5 ml, i.e. 0.5 cc: 1 unit ratio – a substantial improvement for future cases.  This effectively increases the units of liquid steroids *twenty-fold*; a tacit recognition of the inadequacy of the advisory guidelines under which this case falls.

[10]This is consistent with advice given to Wesley Walls during his February 18, 2003, office visit: "Now, I like – I like the – actually, the six milligram bottles better. The only problem is the six milligram bottles come with only a one cc bottle of liquid. So what I do is I give people just extra bottles to mix it with.  And if you mix six milligrams with four and one-half cc's of water, you come out with one-quarter cc per

Using this guidance, the HGH per shot seemingly doubles at the discretion of the patient. The Defendant gives different guidance in a subsequent, undated note:

> For this shipment, you have Saizen instead of Somatropin. The difference is that it's 5mg and has a 10cc diluent bottle I think you had used before. I'd probably dilute with 1cc in the powder bottle and draw from that, or use 3 3/4 cc and you'll have a 1/4 cc/unit injection. ( And use the water bottle to keep the HGH)

The notes seem to indicate a predominant 1/4 cc per unit, with some variation up to ½ cc. The purpose of this explanation is to indicate to the Court the difficulty of calculating units based upon doctors notes, shifting dosage instructions, and inadequate guidelines. The futility of the exercise is further demonstrated by the conversion ratio, and the not-so-exaggerated notion that, even if the anabolic steroid conversion factors were adopted for HGH, the quantity required to move an HGH trafficker into a custodial sentence is monumental. This further demonstrates the inadequacy of the advisory guidelines in assisting the Court in imposing a reasonable, just sentence based solely upon the quantity of performance enhancing drugs in the case. A sentence more in line with the conduct must be more than a mere mathematical calculation. For that, the Government respectfully requests the Court to consider the entirety of the conduct at issue in deriving a fair sentence.

---

unit, which is – it's a measurable shot, okay? That's what – that's how I mix mine. The old five milligram you had to measure three and three-quarters, and that's kind of hard to see in a syringe...But four and a half is easy."

14

III.    **The defendant's inexcusable prescribing of anabolic steroids to a teenager is not accounted for by the guidelines.**

On May 9, 2002, the Defendant was presented with a patient one month shy of his fifteenth birthday.  The patient was five feet, ten inches tall and weighed 248 pounds.  Though allergies, fatigue, and lack of concentration are listed as complaints, the primary purpose of his visit was to lose weight.  The patient had previously been evaluated at Duke University; the result was that no clinical problem was contributing to his weight, and that time and maturity would likely correct whatever problem existed.  Dissatisfied with this diagnosis, the parents[11] took the teen-ager to be analyzed by the Defendant, in part because his mother was the Defendant's patient.  As noted by Dr. Wadler, the Defendant did little to diagnose his sexual maturity level, but did subject him to the standard battery of tests given to the football players and body builders.  The test indicated a testosterone level slightly below the normal range for anyone under the age of twenty.  Common sense dictates that the testosterone level of a fourteen-year-old would differ significantly from that of an eighteen-year-old.  Nonetheless, the patient was prescribed testosterone cream on June 26, 2002, and August 13, 2002.  Estrogen also was prescribed in an effort to suppress the patient's natural estrogen production.  After the patient experienced several bouts of nausea, the parents abandoned the Defendant's "treatment" plan.  In his report prepared for this case, Dr. Wadler writes:

---

[11]Worth noting is that the patient's father is a physician.  The parents' lapse in judgment is significant, but it does not excuse the prescribing decision made by the Defendant.

15

Given the height of 5'10" by the time he was 15 years of age essentially rules out the diagnosis of constitutional delay of puberty, a disorder for which testosterone has been used in teenagers. However, if the diagnosis of constitutional delay of puberty was somehow being entertained, which seems inconceivable, then a bone age evaluation should have been performed and it was not. If the diagnosis of hypogonadism in this 15 year old was being considered then the evaluation should have addressed the array of causes for this diagnosis and should have included, at a minimum an assessment of his hypothalamic-pituitary function including FSH and LH levels. The salivary testosterone level of 62 was only very marginally low and if the specimen was not collected in the morning, it may not have accurately reflected his testicular function. In the absence of any demonstrable medical condition, there appears to be *no legitimate medical basis for prescribing testosterone to this teenage boy* (emphasis added).

No allowance is made in the advisory Sentencing Guidelines for this inexcusable conduct by the Defendant. The issue in the public arena regarding anabolic steroid abuse is its growing prevalence among teen-aged athletes. When considering an appropriate sentence for the Defendant, the Court should consider not only the deterrent effect it will have on doctors inclined to wantonly prescribe these controlled substances but also the perception it will have among younger observers; that is, is the issue of steroid abuse much ado about nothing, or are those who traffic in these drugs subjected to real punishment? Title 18, U.S.C. § 3553(b) captures such a concern when it notes that sentences need "to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense." The Government respectfully asserts that a probationary sentence does none of the above.

IV.    **The partial adoption in the presentence report of the March 2006 Amendment to the 2005 Guidelines Manual for converting steroid cream to units results in a piecemeal sentence that does not take into account the totality of the revised sentencing scheme.**

16

The Government recognizes the improvements made to the Sentencing Guidelines under the March 2006 Amendment. As noted in footnote nine, above, the new conversion factor for liquid anabolic steroids will have a significant upward pull on the guideline range of future defendants. The addition of two enhancements – one for prescribing to athletes, the other for using masking agents – also shows the forethought put into a more comprehensive approach to sentencing anabolic steroid and HGH traffickers. Unfortunately, the 25 mg per unit conversion for patches, topical creams, and aerosols guts the sentence in this case. Consider that the unamended guidelines apply to the liquid steroids, which account for 1,217 ml of the controlled substances. Dividing by ten, this yields 121.7 units, a pejorative conversion from the Government's perspective. When a like amount of cream is considered, the math gets worse. For 1,110 ml of cream, adopting the guidance in the Amendment, the 25 mg to 1 unit conversion factor yields 44.4 units. A like conversion ratio for the troches renders them practically irrelevant, and the 50 pill to one unit conversion for tablets results in a whopping 4.5 units. The end result, for 139 prescriptions over 3 ½ years, is 180.44 units. Considering that everything less than 250 units falls into the same category, this number is disastrously low. At this point, the advisory Sentencing Guidelines have all broken the Defendant's way; every possible benefit from the original 2005 Sentencing Guidelines and the March 2006 Amendment have worked in favor of the Defendant.

Consider, then, the conduct specifically addressed and punished under enhancements included in the March 2006 Amendment, both of which would apply in this

case. The first is a +2 enhancement for distributing an anabolic steroid and a masking agent (2D1.1(b)(6)). The second, a +2 enhancement for distributing anabolic steroids to an athlete (2D1.1(b)(7)). Taking up the second enhancement first, the medical records and prescriptions received by six professional football players are specifically analyzed in Dr. Wadler's report. The Wadler report does not include three other players linked to the Defendant, all of whom acknowledge going to the Defendant for performance-enhancing drugs, and at least two of whom actually received these drugs. Clearly, then, with at least *eight* professional athletes receiving performance enhancing anabolic steroids and HGH, the Defendant would be subjected to this new enhancement.

The masking agent enhancement requires a more intimate knowledge of the case and the Defendant's strategy in providing these substances to the athletes. Because the players were routinely tested, the Defendant had to find a way to provide them with performance enhancing drugs while avoiding an adverse test result. He did so by (1) monitoring the ratios of testosterone to precursor and by-product chemicals, (2) avoiding certain anabolic steroids specifically tested for, and (3) prescribing non-detectable human growth hormone. As the Defendant discussed with Wesley Walls on February 18, 2003:

> Now here's the key. You want to use a natural testosterone. You do not want to use testosterone or any kind of Depo, because that's how they test you, they look for the Depo. Because you can't test – if I test you for testosterone, yeah, you're going to have some. And for somebody like you, I can triple your testosterone levels without blowing any whistles. If you use a Depo testosterone, your ratios don't come out right, okay? Because it's – or if you use fake anabolics. Decadurabolin, Winstrol, you know, Anadrol. If you start using those, those little ratios they test will skew. If you use a natural testosterone, your ratios always come out right. Now,

18

your levels will come up; but as your testosterone comes up, its metabolites come up because it will go through the process....Now, you can use patches. I don't know if there's anything in the patches that is testable. What I use for people is a cream, because there's nothing detectable in the cream. It's USP testosterone, same thing your testicles put out, plus a cream base....If you will look into that – again, nothing that's going to blow any whistles. And for you guys, what I'm looking for is non-detectable performance enhancement.

What this clearly demonstrates is the Defendant's efforts to mask his prescribing of testosterone from the NFL testers. Later in the conversation, the Defendant elaborates

Well, you see, everything that I use, I use as bio-identical as I possibly can because it doesn't blow any whistles. Where people get into trouble is using fake stuff. If you use fake stuff, your body has got to deal with it, it gets blocked. Your body doesn't know how to handle it. Everything that we take – if it's a shot, if it's a cream, if you eat it, if you breathe it, everything goes through these pathways. And if you take weird chemicals your body goes, "What the fuck is that? What do I do with this?" So while it's trying to process it, it builds up. And that's where they catch people...

The drugs given to the athletes stand in stark contrast to those given to the amateur bodybuilders, who are not tested. A simple analysis of the Defendant's prescribing habits, as detailed in the Wadler report, indicates a clear preference for the steroid cream, troches, and HGH for the professional athletes. Please see, for example, counts 9 (troches), 12 (cream), 13 (cream), and 35 (HGH), corresponding to Patient B, a professional football player, and counts 21 (cream), 24 (cream), 26 (cream), 37 (HGH), 40 (HGH), 42 (HGH), and 43 (HGH), corresponding to Patient C, another football player. Contrast those regimens with Patient D, an early patient of the Defendant's and an amateur bodybuilder. From November 1999 through June 2001, Patient D received human growth hormone, testosterone enanthate (injection), halotestin (oral), Anadrol 50

19

(oral), testosterone cypionate (injection), troches (lozenges), and Deca-Durabolin (injection). The dramatically different protocols are directly attributable to the fact that Patient D was not subjected to testing by the NFL. Clearly, then, a major factor considered by the Defendant when providing these drugs was ensuring that his tested patients were not caught. As stated earlier, he did so by monitoring the levels of testosterone to precursor and by-product chemicals, avoiding certain anabolic steroids specifically tested for, and prescribing non-detectable human growth hormone. This is precisely the conduct addressed in the March 2006 Amendment.

The point of demonstrating the Defendant's violation of these new enhancements is not to argue their application to his sentence, but to show the Court that, if it is inclined to apply any of the Amendment, it should note that the Amendment is a comprehensive fix to an inadequate previous guideline. Piecemeal application ignores the enhanced penalties for using masking agents and prescribing to athletes. It also puts a Band-Aid on what the Government contends is a fatally deficient advisory system and gives the appearance of arriving at a workable solution. The Government contends that the March 2006 Amendment should not be applied in this fashion. The Court should consider the 2005 Sentencing Guidelines as they stood at the time of indictment, recognize their significant deficiencies as applied to this case, and grant an upward variance to meet the criteria established in 18 U.S.C. § 3553. If persuaded to do so, in light of all the facts presented in this Motion and in previous petitions and hearings, the Government is convinced that the justice of a custodial sentence will be self evident.

## CONCLUSION

The Government respectfully moves this Court to grant an upward departure from the Sentencing Guidelines under Section 5K2.0, considering the factors listed in Title18 U.S.C. 3553, and impose a custodial sentence that will reflect the nature, circumstances, and seriousness of the offense, promote respect for the law, provide just punishment for the offense, and afford adequate deterrence to similar criminal conduct. The Defendant's actions, as firmly established by the evidence in this case, warrant a sentence substantially in excess of the probationary sentence derived from the 2005 Sentencing Guidelines.

Respectfully submitted,

REGINALD I. LLOYD
UNITED STATES ATTORNEY
District of South Carolina


By: s/Winston D. Holliday, Jr.
Winston D. Holliday, Jr. (ID# 7597)
Jane B. Taylor
Assistant United States Attorney
1441 Main Street, Suite 500
Columbia, South Carolina 29201
(803) 929-3000

June 12, 2006